Fred Henry **MILLER**, Appellant,

v.

**STATE of Missouri, Respondent.**

No. 55708.

Supreme Court of Missouri, Division No. 1.

Dec. 13, 1971.

L. Michael Lorch, Piedmont, for appellant.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for respondent.

HIGGINS, Commissioner.

Appeal *from denial, after evidentiary* hearing, of motion under Criminal Rule 27.26, V.A.M.R., to vacate and set aside judgment of conviction and sentence ·to life imprisonment entered upon a plea of guilty to the charge of murder, first degree.

As grounds for relief, movant asserted he was suffering from mental disease or defect at the time of his offense October 25, 1952, and when he pleaded guilty November 26, 1952, which precluded his understanding of the charge and cooperation with counsel; that the information was not legally sufficient; and that he did not have adequate counsel.

Hearing on the motion was accorded December 16, 1969.

Marvin J. Potthoff, chief medical administrator, Veterans Hospital, Poplar Bluff, Missouri, identified a clinical record and narrative summary of an admission of movant to that hospital November 23, 1952. He was admitted at 11:00 a. m., by stretcher "with a history of having cut his left arm with a razor about 9:00 P.M. the night before while in jail." There were scratch marks on the left forearm with one wound "approximately 1½ cm long in a transverse direction; it was through the subcutaneous fat but apparently no deeper and there was no active bleeding from the wound at the time he was first examined." The patient was treated by bed rest, intravenous glucose and saline solutions, and a tetanus booster. He responded satisfactorily, was able to get out of bed, and, at 9:00 p. m., was discharged in custody of the sheriff with instructions to secure penicillin therapy from a local physician. The discharge diagnosis was "Incised wound, left arm; treated and improved."

Robert Rosson, registrar at Fulton State Hospital, identified the hospital record of Fred Henry Miller, admitted to that hospital December 9, 1953. The record showed that Governor Donnelly, on December 8, 1953, upon declaration of insanity and recommendation by the Division of Mental Diseases, suspended execution of the life sentence of Fred Henry Miller and or-

dered him transferred to Fulton State Hospital until restored to reason. The record also contained a letter of the prison neuropsychiatrist, dated December 4, 1953, reciting observation of Fred Henry Miller for the previous six weeks, during which he was "noted to stand and stare off into space for hours at a time. * * * It would seem obvious that he is experiencing auditory hallucinations * * *." Between December 14, 1953, and February 1, 1954, Fred Henry Miller was given fourteen electroconvulsive therapy treatments on a ·diagnosis of "SPD, Antisocial Reaction, c Paranoid Trends * * * Symptoms: Delusional, hallucinatory, confused, and slightly uncooperative." The result was "Slight improvement evidenced in mental condition." A psychological report of December 29, 1953, summarized Fred Henry Miller to be "of measured *dull normal* intelligence * * * sensitive to the environment and reacts aggressively to slights or threats, real or imagined. He is guided largely by his emotions and his thinking is of an illogical sort. He possesses a strong paranoid system. He has a long history of antisocial behaviour. The patient is suicidal and states that he is determined not to serve out his sentence * * *." Staff conference report of May 2, 1956, showed a diagnosis of "Schizophrenic reaction, chronic with occasional paranoid rage outbursts in sociopathic personality. * * * recommended that continuous observation and treatment be pursued." A similar staff conference result was reported August 15, 1956. A staff conference report of April 18, 1957, showed a diagnosis of "Sociopathic personality with schizoid characteristics and emotional instability. * * * recommended that he be returned to the penitentiary." A medical report of October 3, 1957, showed patient to be in "total remission" upon leaving the hospital in April. On April 23, the hospital recommended to the governor that Fred Henry Miller be retransferred to the penitentiary and Governor Blair revoked the stay of execution and ordered the patient returned to the penitentiary.

Dr. Donald B. Peterson, superintendent of Fulton State Hospital, agreed "essentially" with an opinion of Dr. George Ulett that movant's act of "slicing his arm" while in the Wayne County jail "ranged from malingering to psychotic behavior." He thought it possible that movant was psychotic upon admission to the V. A. Hospital at Poplar Bluff, not on the basis of any of the foregoing records but on "the opinion on any certain date several years ago any of us could have been psychotic." Upon reference to the May 2, 1956, staff conference report, Dr. Peterson stated that "schizophrenic reaction with a bit of sociopathic personality is a personality deviation." He did not call the condition "mental illness." He felt that "more schizophrenics than not can cooperate [with counsel] for a time." Between periods of any rages, he would be able to cooperate. He had no way of determining seventeen years after the fact of movant's offense whether he was then normal or psychotic; however, upon consideration of the facts of the offense and the medical records in evidence, his opinion with a reasonable degree of certainty was that defendant would have been able to cooperate with his counsel.

Elora M. Ward, clerk of the Magistrate Court of Wayne County, identified records showing that on October 27, 1952, defendant waived his preliminary hearing before Judge Matt H. Reichert upon a complaint filed October 25, 1952, by C. P. Turley, assistant prosecuting attorney, that on October 24, 1952, defendant, in Wayne County, feloniously, premeditatedly, and of his malice aforethought, assaulted Rose Marie Brand with a pair of scissors and a hammer, thereby killing Rose Marie Brand. The record showed also that defendant was accorded a preliminary hearing and, in either event, that he was held for trial in the circuit court.

Ethel Montgomery was the circuit clerk of Wayne County in the fall of 1952. She was unable to find the file of this case and could not account for its loss. She was

present when movant pleaded guilty. He was represented by Mr. William T. Powers. She heard movant ask for a death sentence which the court, Judge Eversole, would not give him. His appearance seemed "all right" to her. She could see no difference in movant's demeanor at the hearing from that at the sentencing. She had not heard any other defendant ask for a death penalty. Mr. Turley filed the information on November 26, 1952; Mr. Powers was then appointed, and the plea was entered the same day.

Dr. Leroy M. Baker, medical director at the penitentiary, supervised Fred Henry Miller in 1966 and 1967 and for a short period in 1969. He did a satisfactory job as inmate nurse in 1966 and 1967; "he wasn't a good employee" in 1969. "I dismissed him." In his opinion, movant "has, like all of us, periods where he is not as cooperative, but I am sure we are all this way. He appeared to be cooperative most of the time I knew him."

C. P. Turley, in 1952, was prosecuting attorney of Carter County and also assistant prosecuting attorney in Wayne County because Roy McGhee, Jr., the regular prosecuting attorney, was in the armed services. "He appointed me." He first saw Fred Henry Miller on the night of the offense in the city jail in Piedmont. His condition was normal. He had been drinking some. The only other time he saw him was in court. He seemed under more strain the night of the killing. There was nothing unusual in his appearance in the magistrate court. His request for a death sentence in the circuit court "was a bit unusual. He said nothing else or did anything else unusual." He did not call any actions to the court's attention, "whether I had any reason to might be a different matter. I heard about slashing his wrists or arms. I heard this statement in the courtroom, that was unusual. I had some kind of notion about the cutting, the cause of it. * * * I got the impression he was greatly infatuated with a young lady, who was present at the killing, that

when she got here to the jail and saw where the boat drifted to, she cut loose. * * * It made him very despondent. The reaction to slashing his wrist was to call her attention to something like the psychiatrist said here." He did not feel he should have called the wrist cutting to Judge Eversole's attention or he would have done so at the time. There was no hearing on defendant's "competency or his ability to cooperate with his attorney in his defense." His recollection was that the plea proceedings were concluded prior to lunch on November 26, 1952.

Norma Goodman was a secretary who typed a statement given by defendant in October, 1952. Defendant's only concern when he signed the statement was whether another person, a female, was involved.

Wilson Penturf, sheriff of Wayne County in 1952, found Fred Henry Miller on the occasion of the slaying in an alley. "* * * he fit the description that had been given me and I took him into custody. * * * he was somewhat under the influence of intoxication. He wasn't absolutely normal. He wasn't drunk, but he was under the effects of it to some extent." In the course of conversation, it developed that defendant was willing to give a statement "if I let him talk to Maxine Bollinger." After he talked to her he gave his statement. At the time he had reasonable concern for his own health and safety. Upon the occasion when defendant slashed his arm, his deputy called him early in the morning. He went to the jail and found him lying on the floor. "* * * his arm was folded up, like he was kind of laying on his arm. * * * he had quit bleeding and he was unconscious." The sheriff took him by ambulance to the V. A. Hospital in Poplar Bluff and, after treatment there, brought him back to jail that night. At no time while he was in jail did defendant indicate any depression, and he was cooperative at all times. The sheriff thought defendant's request of a death penalty to be "unusual." The written statement to which the sheriff referred was ad-

mitted in evidence to show its voluntariness and that "all the warnings given him are incorporated in the statement."

Marvin Bowles, coroner of Wayne County, went to the jail to see if defendant knew where the hammer was. "He was a little excited. Shortly, he told me the hammer was under a chair in the livingroom. * * * He asked someone to call Morris Shenker for him." He was cooperative; he was not belligerent.

Sergeant John N. Crow of the Missouri State Highway Patrol saw defendant at the jail in Piedmont the night of the offense. "He had been drinking some, probably under some influence of some light narcotics or something." Sergeant Crow and others transported him to the county jail in Greenville where he was advised of his constitutional rights. There was nothing unusual in his behavior. "He was possibly nervous, some, as he naturally would be." He appeared normal when he gave the statement to Sheriff Penturf, which he transcribed.

William T. Powers was deceased at the time of this hearing.

The court's findings pertinent to appellant's contentions were: that the information was filed by C. P. Turley of Carter County, Missouri, who had been appointed assistant prosecuting attorney for Wayne County by Roy McGhee, Jr., who was serving in the army, and no attorney in Wayne County would accept such an appointment; that the information was filed November 26, 1952; that William T. Powers was then appointed to represent defendant and defendant appeared with Mr. Powers and entered a plea of guilty after opportunity and reasonable time to consult with counsel and a friend; that defendant made an admission of guilt after being fully advised of his rights; that defendant slashed his arm about two days before entering his plea and was taken to a hospital; that when first found, he was holding his arm in such a way as to stop the bleeding; that on December 9, 1953, more than a year after his plea, he was admitted to Fulton State Hospital and later returned to the penitentiary where he was characterized as a malingerer; that there is no substantial credible evidence that defendant was suffering from any mental disease or defect at the time of the offense or at the time of the plea that would excuse his acts or prevent his understanding of the charge or cooperation with counsel; that the conditions found December 9, 1953, would not necessarily indicate that such condition existed a year earlier; that the evidence wholly fails to show defendant did not have adequate counsel.

Accordingly, the court concluded movant was entitled to no relief under the evidence and overruled his motion.

Appellant contends: (I) that the court erred in finding there was no substantial credible evidence that appellant was suffering from any mental disease or defect at the time of the offense or at the time of his plea that would excuse his acts or prevent him from understanding the charge or prevent him from cooperating with counsel in his defense; (II) that the court erred in finding the information legally sufficient even though signed by a non-resident of Wayne County; (III) that the court erred in finding that movant failed to establish inadequacy of counsel "in that counsel failed to call to the court's attention the fact that movant was mentally ill"; (IV) that the court erred in finding defendant's confession to be valid.

Again, a detailed statement of the evidence adduced at the evidentiary hearing demonstrates the lack of merit in appellant's contentions, and that the court's ruling was not "clearly erroneous," the burden to so show being on movant under Criminal Rule 27.26, V.A.M.R.

Under his first contention, appellant's argument is that his incompetency was shown by his "attempted suicide" two days before his plea and by his request for

a death penalty upon entry of his plea. Relying principally upon Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, Brizendine v. Swenson, W.D.Mo., 302 F.Supp. 1011, and Carpenter v. State, Mo., 449 S.W.2d 584, appellant asserts: " * * * it was reversible error for the Court, *sua sponte*, to fail to order an evidentiary hearing into appellant's sanity, and * * * to fail to grant post conviction relief, on the basis that appellant was, at the time of entering his plea of guilty, * * * incompetent."

The difficulty with appellant's argument is that the evidence does not bring his case into the posture envisioned by his authorities. The evidence surrounding his confinement at Fulton State Hospital beginning December, 1953, does not show that even then was he without an ability to understand or cooperate, and certainly it does not show any such lack of ability in October and November, 1952. Similarly, appellant's arm slashing does not necessarily imply attempted suicide and it certainly does not prove mental disease or defect. The arm slashing occurred under circumstances in which it was reasonable to believe appellant was depressed as a result of his girl friend's rejection. His psychiatrist, Dr. Peterson, felt the act to suggest malingering; he could not say it proved a then-existent psychosis; and, even if it supported an inference of attempted suicide, that alone does not demonstrate insanity. See City Nat. Bank & Trust Co. v. National Life Ins. Co., W.D.Mo., 111 F.Supp. 876. Neither can it be said that the desire for a death sentence proves insanity, incompetence, or inability to cooperate. It is equally consistent with his "attempted suicide" as a result of rejection. The prosecuting attorney's judgment with respect to whether he knew of enough circumstances to suggest to the court a question of defendant's mental condition is shown, at best, to be a debatable circumstance, and the court resolved it consistent with the attorney's judgment. There is no evidence to show whether the appointed attorney or the court knew, or should have known, of any reason to suggest a Pate v. Robinson type hearing. To the contrary, there is the opinion of appellant's psychiatrist that he was not psychotic at the time of his offense and plea and that he was then capable of cooperation.

With respect to contention II, suffice to say that the alleged insufficiency of the information is not, in any way, an attack on its substance; and any alleged insufficiency on the ground that it was signed by an unauthorized person was waived when defendant, with assistance of counsel, entered his plea of guilty to the charge contained in the information. State v. Smart, Mo., 328 S.W.2d 569, 575, 576 [13]; Walster v. State, Mo., 438 S.W.2d 1, 3 [3, 4].

Appellant's third contention fails for the reasons developed with respect to contention I, and, in particular, that there is no evidence to show what counsel did or did not do with respect to matters brought to the attention of the court at the time defendant pleaded guilty.

Finally, movant is not entitled to relief on any asserted invalidity of his confession because it does not appear to have been before the court at the plea proceedings; his plea would not be invalidated simply because he made a confession prior to pleading which might be inadmissible, Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785; and it would not have been inadmissible on account of any promise, given before its existence, that a girl friend would not be prosecuted, State v. King, 342 Mo. 1067, 119 S.W.2d 322.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.