James Edward DROPE, Movant, Appellant,

v.

STATE of Missouri, Respondent.

No. 34797.

Missouri Court of Appeals, St. Louis District, Division Two.

June 5, 1973.

Motion for Rehearing or Transfer Denied Aug. 16, 1973.

Application to Transfer Denied Oct. 8, 1973.

Bryan, Cave, McPheeters & McRoberts, Charles A. Weiss, St. Louis, for movant, appellant.

John C. Danforth, Atty. Gen., Jefferson City, J. Brendan Ryan, Circuit Atty., Julian D. Cosentino, Asst. Circuit Atty., St. Louis, for respondent.

SMITH, Judge.

James Drope appeals from a judgment of the Circuit Court denying relief on his motion filed pursuant to Rule 27.26, V.A.M.R. Specifically, he complains of the trial court's finding: (1) that he was not entitled to a psychiatric examination and hearing before, during, and after his original trial to determine his competency to be tried; (2) that he was not denied due

process when the trial court conducted a portion of his trial in his absence; and (3) that he was not denied effective assistance of counsel.

Drope was convicted in June, 1969 of the forcible rape of his wife. That conviction was upheld on appeal. See State v. Drope, 462 S.W.2d 677 (Mo.1971). The rape charged occurred on January 17, 1969. Drope and four of his friends entered the Drope home at approximately 1:30 a.m. and, threatening Mrs. Drope with a gun, tied her spreadeagled to the bed. They also acquired a knife from the kitchen as an additional coercive device. For approximately the next two hours they proceeded to have intercourse with her, oral and vaginal, frequently two men concurrently. Each of the four comrades of Drope had both forms of intercourse; Drope himself had oral and rectal intercourse. Drope was present throughout and apparently directed the activities, telling his friends what to do. Upon completion Mrs. Drope was left bound and gagged and, as he left, Drope advised her, "[T]his isn't the first time this is going to happen." Mrs. Drope was released by the eldest of their five children (six years old) all located in the adjoining room, who cut the ropes with a kitchen knife. Drope was apprehended shortly thereafter when he returned home. While in police custody he admitted the activity and said it started out as a "joke." Following a finding of guilty by the jury the court [1] assessed punishment at life imprisonment.

Drope was freed on bond shortly after his arrest and was represented by counsel retained by his mother. Counsel had Drope examined in February 1969 by Dr. Joseph Shuman, a psychiatrist. Dr. Shuman prepared an extensive report after talking with Drope for approximately an hour and a half, and with Mrs. Drope, his wife.

We set out in an appendix that report *in toto* because of its relevance to movant's

contentions. Following this report Drope, through his counsel, filed a motion for psychiatric examination which was denied because not in proper form. The case was set for trial, and Drope was present on the trial date. His counsel was not and explained upon his arrival that he understood the matter was not to be set until September (the trial date was June) and his client would be examined prior to trial. Counsel also professed his unreadiness to try the case. Continuance was denied and a jury selected. The next day the evidentiary portion of the trial commenced. Drope's wife testified as well as three other witnesses, two of whom were present in police headquarters when Drope made a statement admitting his participation in the rape.

The next morning Drope shot himself in the stomach with a .22 rifle. Testimony taken in connection with Drope's motion for new trial was conflicting. His testimony was that he remembered nothing about the incident except the hot pain in his stomach. His witnesses testified he was unconscious after the shooting and did not regain consciousness for some considerable time after his surgery. There was testimony, on the other hand, that Drope was conscious in the hospital and stated that he shot himself to avoid trial and to prevent being convicted for something he didn't do. Drope did have surgery and remained hospitalized for 21 days. Upon learning of the shooting the trial judge ruled that Drope's absence was voluntary and proceeded with the trial. The court's action in doing so was upheld on appeal.

Movant's motion for new trial and the hearing conducted pursuant to it devolved into the production of evidence to establish whether Drope's shooting was voluntary or involuntary. The trial court obviously found it to be voluntary. No psychiatric testimony was presented at the hearing on the motion for new trial.

---

1. Drope was tried as a second offender. Sec. 556.280 RSMo 1969.

Upon his hearing on his 27.26 motion, Drope produced two psychiatrists. Their testimony was uncontradicted. Both testified that they were of the opinion that there was reasonable cause to believe that a person who would attempt suicide might not be competent to understand the proceedings against him, if he was in the midst of trial. Dr. Shuman additionally testified there was a possibility that a man could voluntarily shoot himself to prevent continuance of the trial. He also stated that at the time of his earlier examination he would not have believed Drope was contemplating suicide. Both doctors opined that even if the suicide attempt was to prevent continuance of the trial, they would still desire an examination to determine whether the man was competent to stand trial.

Movant's first two points are inextricably woven together and present the question of Drope's mental state during the trial. In his first point he contends the court erred in not ordering psychiatric examination and hearing to determine his competency to stand trial.

Section 552.020, RSMo 1969 provides: "(2) Whenever any judge or magistrate has reasonable cause to believe that the accused has a mental disease or defect excluding fitness to proceed he shall, upon his own motion or upon motion filed by the state or by or on behalf of the accused, by order of record, appoint one or more private physicians to make a psychiatric examination of the accused . . . ."

Paragraph 6 requires that if the results of the examination are contested, or if the judge on his own motion orders it, a hearing shall be held to determine competency. In Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) the statutory scheme provided by Missouri was elevated to constitutional dimensions. There it was held that where at any time during the proceedings reasonable doubt of defendant's competency arose, the trial court has an obligation *sua sponte* to conduct a hearing on competency. The facts upon which such hearing was required in *Pate* were extensive and came to the trial court's attention during the trial as a result of evidence introduced to establish Robinson's insanity at the time of the offense. It included, in part, evidence that (1) Robinson was hit by a brick while a child and thereafter acted "peculiar;" (2) he had episodes of sudden, unexplained violence toward objects and people; (3) he would have frequent dazes and unresponsive periods; (4) he was taken to a state hospital after an episode of violence and was found to be hallucinating and thought someone was after him; (5) he shot and killed his 18 month old son, then shot himself in the head, and then tried suicide by jumping in a lagoon; (6) he killed his common law wife by walking into her place of employment, stared at her for about a minute and then shot her and another man.

■ The test of competency to stand trial, unchanged by *Pate*, is stated in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) as follows: " . . . whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him." (1. c. 402, 80 S.Ct. 789). See also § 552.020(1) RSMo 1969.

By Missouri statute (§ 552.010, RSMo 1969) mental disease or defect is defined as: "congenital and traumatic mental conditions as well as disease. They do not include an abnormality manifested only by repeated criminal or *otherwise antisocial conduct,* whether or not such abnormality may be included under mental illness, mental disease or defect in some classifications of mental abnormality or disorder. The terms 'mental disease or defect' do not include alcoholism without psychosis or drug abuse without psychosis or *an abnormality manifested only by criminal sexual psychopathy* as defined in § 202.700 . . . ." (Emphasis supplied).

In determining whether Drope's rights under *Pate* and the Missouri statutes were violated we must examine whether "reasonable cause" existed of movant's competency at three different times—before the trial, during the trial after the suicide attempt, and at the time of the motion for new trial. Prior to the trial the court had only the Shuman psychiatric evaluation upon which to have made a determination. That evaluation does not raise a reasonable doubt of Drope's fitness to proceed. The report reflects Drope did not have "any delusions, illusions, hallucinations, obsessions, ideas of reference, compulsions or phobias at this time." Mr. Drope was "well oriented in all spheres." "He was able, without trouble, to answer questions testing judgment." Abnormal sexual acts are a part of his "culture" and on the basis of the report even if sexual perversion was a form of mental disease in some cases, it apparently is not in Drope's case. The conclusions are that Drope is (1) sociopathic—a synonym for anti-social which is specifically exempted as a mental disease or defect under Missouri law; (2) sexually perverted—again exempted; (3) borderline mental deficiency—but no indication it is severe enough to prevent cooperation and understanding, and the report indicates the contrary is true; (4) chronic anxiety reaction with depression—treated by the doctor with tranquilizers and again indicated as not interfering with Drope's understanding or cooperation and explained as based in part on his legal troubles.

We are able to put little weight on Mrs. Drope's feelings that her husband had mental problems, as that matter bore on his sexual perversions—not his competency. Nor are certain related episodes where he rolled down the steps because he didn't get his way particularly impressive. These episodes occurred only three times in ten years; in each case he immediately arose and the episodes demonstrate pique more than anything.

There is no indication in this record of any actual failure of understanding or cooperation by Drope with his attorney, nor of any lack of understanding of the nature of the proceedings. We cannot therefore find reasonable doubt of competency to order psychiatric examination or hearing before trial.

Movant contends that his suicide attempt coupled with the earlier report established such doubt during the trial. While recognizing that *Pate* was determined upon facts which arose during trial and which the Court concluded required a competency hearing, we are unable to conclude that *Pate* required the interruption of movant's trial for such purpose. Initially, we do not find in *Pate* any holding that the hearing must occur during trial, rather than immediately thereafter. Secondly, *Pate* involved a *competency hearing* rather than a *competency examination* and hearing as is contemplated by the Missouri statutes. It may be practically feasible for a hearing to be held in the absence of the jury during a trial without unduly delaying the trial. But an adequate psychiatric examination could not be made during the trial without requiring a substantial delay in the trial.[2] And it is at least arguable that a mistrial declared *sua sponte* by the judge during the trial, particularly over the objection of defendant, would bring double jeopardy considerations into play if in retrospect the mistrial was an abuse of discretion. See United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). We therefore hold that it was within the discretion of the trial court, if he became aware of doubts of competency during the trial, to delay ordering *sua sponte* an examination and hearing until the close of the case.

2. One of movant's psychiatrists testified that a week or more was required to examine a defendant certified for psychiatric examination.

We turn to the third time period, the post-trial period prior to sentencing. Once again it is asserted that the suicide attempt coupled with the psychiatric report raised a reasonable doubt of competency requiring an examination and hearing at that point. We will accept *arguendo* movant's contention, inferentially disputed by the state, that Drope's actions in shooting himself was in fact a bona fide attempt at suicide.

We will also accept as true the psychiatric testimony on the 27.26 hearing, that to these psychiatrists, an attempt at suicide would raise a reasonable doubt as to a man's competency to proceed with trial. We note, however, and emphasize, that at no time did these experts testify such attempt established incompetency to proceed but only raised in their expert opinion a doubt. Turning once again to *Pate* we find the following: "The State concedes that the conviction of an accused person while he is legally incompetent violates due process . . . and that state procedures must be adequate to protect this right." (383 U.S., 1. c. 378, 86 S.Ct. 838).

We do not find in *Pate* any indication that the evidence of reasonable doubt of competence can be elicited in the first instance during a post-conviction proceeding seeking to set aside the conviction. To reiterate, in *Pate* the evidence upon which reasonable doubt was found to exist was all before the trial court during defendant's original trial. In Drope's case, the critical evidence relied upon to establish the reasonable doubt, the psychiatric testimony, was presented for the first time in the post-conviction 27.26 proceeding. At the time judgment was finally entered and sentence imposed against Drope, the court had before it the pre-trial psychiatric report and the fact of an attempted suicide, and evidence that that attempt was to avoid trial. We are unable to conclude that as a matter of law an attempt at suicide creates a reasonable doubt as to the

movant's competency to stand trial. See Miller v. State, 473 S.W.2d 413, (Mo.1971) 1. c. 418. And the expert medical opinion of psychiatrists of such doubt cannot be imputed to a trial judge where such expert opinion is not before him. The procedures employed for protecting Drope's rights were not shown by movant to be inadequate. We cannot hold the finding of the trial court regarding defendant's competency to be clearly erroneous.

Movant's second point concerning the voluntariness of his absence from trial is largely determined by our ruling on the first point. Upon the evidence which the trial court had before it on the motion for new trial it was a permissible finding that Drope's suicide attempt was a voluntary act to avoid trial and so a waiver of his right to confront his accusers. The Supreme Court so found upon appeal. See State v. Drope, *supra*. The psychiatric testimony at the 27.26 proceeding that such an attempt might have been the product of a lack of competency does not meet the burden of proof placed upon movant. Again we cannot hold the trial court's finding to be clearly erroneous.

Movant also asserts the ineffectiveness of his counsel. This is based upon (1) counsel's statement that he was not prepared for trial, and (2) counsel's failure to properly assert Drope's incompetence to stand trial. No testimony was presented from movant's trial counsel. He was apparently ill at the time of the 27.26 hearing, but the court left the hearing open to permit counsel's deposition to be taken. Either it was not taken or if taken was not made an exhibit or furnished to the court. The record of the trial does not support counsel's statement of his lack of preparation. Nor are we required to ignore what we know to be true, that such statements are frequently made to support a request for a continuance, as was true here.

Movant also contends counsel failed to present his defenses and failed to call his witnesses. No potential witnesses have ever been identified by movant; no indication of what testimony they might give has ever been presented; and the record indicates Drope was to have the witnesses present in court on the morning he shot himself but apparently did not. Nor does movant delineate any defense which his counsel failed to present, except possibly insanity. Yet even there the record does not support a conclusion that such a defense was practically available. Neither the report of Dr. Shuman nor the nature of the crime itself demonstrate the availability of such defense. Movant's evidence does not meet his burden of establishing counsel's ineffectiveness due to lack of preparation.

■ As to the second ground we are once again without evidence to support a conclusion that counsel failed to advance a right of movant which he believed to be meritorious. The record before us is singularly devoid of any evidence that Drope was not in fact able to consult with his lawyer with a reasonable degree of understanding and that he lacked a rational as well as factual understanding of the proceedings against him. Unlike Brizendine v. Swenson, 302 F.Supp. 1011 (W.D.Mo. 1969) there is evidence that counsel was aware of the provisions of Chapter 552, RSMo 1969, and made some effort to proceed under them. That he subsequently did not pursue such line of attack does not establish ineffectiveness, for it may equally well be based upon a considered judgment that such an attack was without support or merit. The trial judge who presided at both the original trial and the 27.26 proceeding had an opportunity to observe Drope's conduct and to determine the degree of cooperation existent. Counsel at no time complained of his client's inability to cooperate with him. It must be remembered that incompetency to stand trial is not established by showing the defendant has mental problems. The test enunciated by *Dusky, supra,* and the statute requires more. And in analysing counsel's effectiveness we are not required to ignore the oath which every lawyer in this state takes that: ". . . I will not counsel or maintain . . . any defense except such as I believe to be honestly debatable under the law of the land;" and "will never seek to mislead the judge or jury by any artifice or false statement of fact or law; . . ."

■ The competency for trial is, in a very real sense, determined by the relationship and cooperation between client and attorney. In the absence of evidence that in fact such cooperation was not present, we are unable to brand a lawyer's failure or refusal to allege and testify to that which he does not believe to be true as ineffectiveness. Representation of a client does not require or permit subornation of perjury or perjury itself. On the record before us, it is just as plausible to believe that counsel's failure to assert incompetency at the trial and afterward was based upon a factual knowledge that the tests of incompetency to stand trial had not been met, as that it was based upon ineffectiveness. We cannot find the ruling of the trial court clearly erroneous.

Judgment affirmed.

SIMEONE and KELLY, JJ., concur.

## APPENDIX

"February 22, 1969

"Dear Mr. Watson: Pursuant to your request I performed a psychiatric evaluation on Mr. James E. Drope in my office on February 20th 1969. Mr. Drope had been driven to my office by his wife. This was a healthy looking, well built, well-developed white male, who appeared to be markedly

agitated. The patient at times would wring his hands. He had difficulty in talking because of his marked anxiety.

"Mr. Drope explained that one day he came home from the union hall, after not having gotten any work and he started drinking; apparently he spent the day drinking. He said that he got home at 3:30 p. m. and went to sleep. His wife woke him at 6:00 p. m. and sent him to the store, but after buying his groceries he also went to the tavern for a few drinks and also got himself a six-pack. He said that he started drinking and then was joined by a few men aged twenty to twenty-two. They, apparently, drank with him until about 2:30 a. m. He said they had been talking about going over to East St. Louis and finding some girls. Mr. Drope then claimed that the next part of the history is really a blank to him. He repeats what he has been told, but claims that he has absolutely no memory for it. He says that all he remembers is that he was bringing the groceries upstairs when he saw some police come into the street and up and around his house and they arrested him after his wife screamed to them to watch out for him because he was carrying a gun. Mr. Drope said that he doesn't remember anything, but he was told that he and the four men with him went to his home and raped and threatened his wife with a gun and a knife and that this occurred between 2:30 and 4:00 a.m.

"Mr. Drope said that he was taken to the hospital and was examined and then he was taken to the jail and eventually to the City Workhouse. He said that there were several warrants against him. After being in the workhouse for one or two weeks he was let out on bond. He said that he has been trying to work since then. He also said that his wife wants to drop the charges, but that he is due back in court on February 26th. He said that he and his wife are now getting along okay.

"PAST HISTORY: Mr. Drope was born in Gideon, Missouri, on April 29th, 1937, the second of five children. The youngest three were the product of a different father. Mr. Drope said that he has seen his father only four times in his life. Apparently, his father was divorced by his mother when Mr. Drope was still only a baby. A stepfather raised him, but he died in 1952. The mother has since remarried several times and is now with her fourth husband.

"Mr. Drope said that he was shunted back and forth to many cities and schools and he finally quit school in the fourth grade when he was fifteen or sixteen years. This occurred after his stepfather died and he had to go to work. He was living in St. Louis at the time. He had numerous jobs such as being a newspaper boy, a delivery boy, a packer, etc.

"Mr. Drope first married at the age of seventeen and was divorced at the age of twenty-three. He and his wife had four children; they are now with his ex-mother-in-law in Arkansas. His exwife also has remarried. These children run in age from fifteen to eleven. The patient said he has seen them only once in the past two years.

"In 1958, when the patient was twenty-one, he was living in St. Louis and, because of the need for money and because he was not working, he took part in a burglary, but he was caught. He served thirty-six months in the penitentiary in Jefferson City. While he was there his wife divorced him. At this point the patient pointed out that he has very much trouble remembering these things. He said that it seems like it was only a week ago. He remarried after his release from the penitentiary, but he is unable to remember the date. He has since had five children and he says they range in age from five or six to six months. Patient has had numerous jobs. In the last few months he has been

working out of the union hiring hall for trucks. He said that he made a living and that he also did odd jobs to supplement his other pay. He admits that he is greatly in debt and just cannot catch up.

"PAST MEDICAL HISTORY: The past medical history reveals the usual childhood diseases, but there have been no operations, although the patient has apparently been injured many times. Once, as a child, he fractured a leg and due to this he was discharged from the service. He said that he enlisted at the age of seventeen but was discharged only a month later because of that bad leg. Mr. Drope has also one other arrest and that was for car theft. He did not serve any time because he was placed on parole immediately. That was over ten years ago.

"Mr. Drope said that he smokes three or four packs of cigarettes a day. He said that he drinks only when he is upset and that he does drink to the point of getting drunk.

"In talking further with Mr. Drope, in response to a question about hearing voices, he thinks that he heard voices after his stepfather died and he also described hearing voices only last January and that he saw a vision of his stepfather and grandmother and, apparently, had a conversation with them. The patient admits that he had been drinking at that time also.

"Mr. Drope was markedly agitated and upset. He is not a very good historian and he claims much difficulty with memory. He appeared to be cooperative in this examination, but he had difficulty in participating well. As a matter of fact, before he left my office I gave him a sedative to get him calmed down. I also gave him some samples of medication together with a prescription for these medications in the hope that he can get himself relaxed so he can carry on more efficiently. The patient had a difficult time relating. He was markedly circumstantial and irrelevant in his speech. He showed marked anxiety

and there was no sign of any depression or apathy at this time. His affect seemed to be harmonious with his thought content. There was no sign as to the presence of any delusions, illusions, hallucinations, obsessions, ideas of reference, compulsions or phobias at this time.

"In a simple IQ exam Mr. Drope was able to achieve a score in the low normal range, but on further tests for knowledge of current news events and famous names and places, he did very poorly. Mr. Drope was well oriented in all spheres. With much difficulty he was able to explain a few abstractions. He also showed some difficulty in explaining some differences. He was able, without trouble, to answer questions testing judgment. He had much difficulty even doing the simple counting and calculations problems.

"After finishing with Mr. Drope I then talked alone with his wife. She is twenty-four years old and says that she has been married for seven years and has five children. She admits that she has left him several times in the marriage, but came back because of having no money. Often she would leave him because of his sexual perversions. She admits that in the past he has inserted a bottle in her vagina and he has also had rectal intercourse. She said that he had once mentioned that he might do something like bringing up some men to take care of her so that he had actually had it in the back of his mind before. She also said that he is very suspicious and is always accusing her of running around. Apparently, his first wife ran around. Mrs. Drope admits that her husband drinks much, but she doesn't remember him being real drunk more than three times since they were married. She also describes what she feels is strange behavior on his part in order to get sympathy. This would include even falling down flights of stairs to gain sympathy from her. Mr. Drope would stay away two or three days at a time if he got mad at her, otherwise they got along very well. She

thinks that he has been always as nervous as he is now and that he would not hold a job very long because of his nervousness.

"IMPRESSION: If it can be said that some people are born with a silver spoon in their mouth then it must be admitted that Mr. Drope was born with a fish hook in his. He has always led a marginal existence. He received practically no education and no training for any worthwhile occupation. Having had several fathers is certainly not conducive to proper father identification. Apparently, abnormal sexual acts are part of Mr. Drope's own culture. He has a history of occasional drinking, although he seems to drink more often than his wife suggests. He also has a history of anti-social conduct. At the present time Mr. Drope is certainly markedly agitated and upset. He finds himself in very much trouble and is confused about the whole thing. I do not find any strong signs of psychosis at this time. This individual certainly needs the aid of a psychiatrist, but I would really not be very optimistic about success about a man like him because I doubt that he would keep up with any kind of psychiatric care, since this requires some modicum of sophistication.

"This is a very neurotic individual who is also depressed and perhaps he is depressed for most of the time. Apparently, he certainly has much reason for this. As for the diagnosis I want to offer: (1) Sociopathic personality disorder, sexual perversion. (2) Borderline mental deficiency. (3) Chronic anxiety reaction with depression.

"The prognosis for Mr. Drope must remain guarded. Perhaps his anxiety can be controlled with medication, but one cannot expect much change in his personality defect.

"Trusting that this is the desired information, I am,

"Very truly yours,

"Joseph S. Shuman, M. D."