STATE of Missouri, Plaintiff-Respondent,

v.

Joseph VANSANDTS,
Defendant-Appellant.

No. 37115.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Aug. 10, 1976.

Henry Rieke and Blair K. Drazic, Asst. Public Defenders, St. Louis, for defendant-appellant.

Brendan Ryan, Circuit Atty., St. Louis, John C. Danforth, Atty. Gen., Preston Dean, Charles L. Howard, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

SIMEONE, Presiding Judge.

This is an appeal by defendant-appellant, Joseph H. Vansandts, from a judgment of conviction entered by the circuit court of the City of St. Louis upon a jury verdict by which the appellant was sentenced to five years in the department of corrections for the offense of robbery in the first degree. § 560.120, RSMo 1969.

This appeal requires us to balance the rights of an accused who allegedly lacks mental capacity to understand the proceedings against him and the right of the state to enforce its criminal laws.[1]

---

1. As Somerville, J., stated in *Briggs v. State*, 509 S.W.2d 154, 156 (Mo.App.1974):

 "When the state initiates criminal charges against an accused, the accused and the state

## I

On September 28, 1972, Mrs. Hazel Burke was employed at the Super Sandwich Shop located at 5200 Chippewa in the City of St. Louis. She was working the 9:00 p. m. to 6:00 a. m. shift alone. The shop was fully lighted. A man, identified as the defendant, Joseph H. Vansandts, entered the store at about 3:30 a. m. and asked for change for a dollar bill. Mrs. Burke went to the register to make change. As she started to make change, she said, "I asked him if he wanted two dimes and a nickel and as I turned to ask him . . . he hit me with a radio." The man hit Mrs. Burke on the right side of the face. The blow "knocked me back away from the register . . . ." The defendant then went to the register and took money.

Defendant then ran out the back door. Mrs. Burke had seen the defendant in the store before—" . . . he had been coming in at night for coffee." At trial Mrs. Burke was "absolutely positive" that the defendant was the man who came in and took money from the register.

Immediately after the incident, Mrs. Burke called the police and her employer, Mr. Kenneth Keisker. Officer Kenneth Briscoe was dispatched to the sandwich shop, and upon his arrival he interviewed Mrs. Burke and found her face was "red and swollen." He also found the radio on the floor behind the counter. Mrs. Burke gave the police a description of the assailant. Mr. Keisker also came to the store, checked the cash register and found thirty-eight dollars missing. Mrs. Burke was taken to the hospital for treatment. Officer Briscoe called the Evidence Technician Unit, and Officer John Vogan of that unit responded. Officer Vogan recovered and took into his possession a small transistor radio from behind the service counter and dusted it for fingerprints. He obtained three "lifts" and forwarded them to the Latent Fingerprint Division of the police department, but the prints were inconclusive, since they were smudged.

The appellant was not immediately apprehended for the offense. It was not until some two years later that he was arrested at the state hospital at 5400 Arsenal Street. Appellant had voluntarily admitted himself to the detoxification unit of the hospital on August 26, 1974. On August 31, 1974, Officer Edwin Bullis of the St. Louis police department arrested the defendant and escorted him to the police station for the purpose of conducting a lineup. Mrs. Burke viewed that lineup, which consisted of four men, and identified the defendant as the person who committed the robbery two years before. After the lineup and after Miranda warnings were given, Officer Bullis interrogated the defendant. The defendant made a statement that " . . . he was there at that restaurant at that time and he struck Hazel Burke on the head with a radio and took thirty-eight dollars."

On October 3, 1974, appellant was indicted for the offense of robbery of the sandwich shop. In a formal motion, the State requested disclosure under the Rules of Criminal Discovery. The motion specifically requested a "written statement from defense counsel disclosing defendant's intention to rely on the defense of mental disease or defect excluding responsibility . . ." On November 6, 1974, the defendant filed its "Request for Discovery" and sought any reports or statements of experts made in connection with the case, "including results of physical or mental examinations . . . ."

are immediately pitted against each other in the most grave adversary proceeding existent in our system of justice. . . . Nowhere, perhaps, is there encountered an area so fraught with basic procedural problems as those arising where an accused lacks the requisite mental capacity to knowingly and meaningfully understand the import of the charges leveled against him and to viably consult with counsel and assist in his own defense. By dictate of the American conscience, long steeped in hallowed traditions of basic fair play and justice, judicial and statutory safeguards have been created to balance the adversary proceeding where it appears that an accused is suffering from a mental disease or defect. Chapter 552 RSMo 1969 . . . ."

Three separate independent psychiatric examinations of appellant were ordered to be conducted prior to trial. The first was as a result of a motion filed on November 8, 1974 by counsel for Vansandts for an order for a psychiatric examination. This motion was granted [by Judge Holt, a judge of the circuit court] the same day. Mr. Vansandts was committed to Fulton State Hospital, and the cause was removed from the trial docket and placed on the Mental Examination Docket. A report dated January 29, 1975 was filed by Dr. Richard K. Jacks, D.O.

On February 13, 1975, a court memorandum was filed noting that the psychiatric report had been received and filed. The memorandum stated that, "neither the State nor the accused nor his counsel having contested the findings of the report within the time allowed, the Court finds . . . that the above-named defendant has mental fitness to proceed . . . ." The court thereupon removed the cause from the mental examination docket and set the trial for March 17, 1975. The appellant was apparently transferred to City Jail. But, on the same date, February 13, 1975, an order was issued transferring Vansandts from the City jail to Fulton because the court [Judge Gaertner, another judge of the circuit] was advised that the defendant "has been engaging in conduct . . . that is detrimental to his own health" and because of a history of suicidal attempts which were "classified by examining psychiatrists to be manipulative and attention seeking . . . ." A few days later, on February 18, 1975, defendant's counsel then filed an "Objection to Findings of Psychiatrist" and requested an examination by another psychiatrist. This request was granted, and another examination was ordered by Judge Gaertner to be conducted by Mid-Missouri Mental Health Center. A second report, dated March 6, 1975, was made by Dr. Jivanlal P. Gohil, M.D., and by memorandum of court this report was received.

The memorandum, dated March 13, 1975, stated that, ". . . neither the State nor the accused nor his counsel having contested the findings of the report within the time allowed, the Court finds . . . that the above-named defendant has mental fitness to proceed . . . ." Again the court removed the cause from the Mental Examination Docket and set the cause "for trial on Monday, May 12, 1975." After this second report, Vansandts was again transferred to the city jail. But again, and on April 11, 1975, the court [Judge Bloom], having been informed that Vansandts inflicted an injury upon himself on numerous occasions while in confinement, ordered the defendant transferred to Malcolm Bliss Mental Health Center for the purpose of another psychiatric examination.[2] A report dated April 30, 1975 was rendered by Dr. Earl P. Dick, M.D. This third report was received by the court on May 7, 1975. Copies of all psychiatric reports were forwarded to counsel for the defendant.

All three reports were similar in nature and findings. Each examination was made independently of the others. They showed that appellant had a history of antisocial behavior and suffered from alcoholism but did not suffer from a psychosis or a mental disease within the meaning of Chapter 552, RSMo 1969. A summary of all three reports is found in Appendix I following this opinion.

Trial of the robbery charge began on May 14, 1975. During the voir dire, defense counsel referred to the fact that one of the issues in the case is that the "final twelve that are selected here might be judging the mental competence of my client." After several voir dire questions by defense counsel, the trial court interrupted and stated, "As far as this Court is concerned there is no question of mental competence before the Court in this trial." Out of the hearing of the jury, it was disclosed that no issue as to mental competency had been raised by

2. An additional memorandum dated April 15, 1975 made reference to the April 11 memo and stated: ". . . The Court, having been advised of the unusual conduct of defendant in cutting himself during confinement, on its own motion has ordered said defendant committed to Malcolm Bliss Mental Health Center for the purpose of having a psychiatric evaluation."

the pleadings, and that the state received no written notice of any defense of mental disease or defect. Defense counsel admitted failure to comply with the statutory notice requirement but attempted to explain this failure by asserting he was unaware of the trial date due to trial docket mixups. Defense counsel reported to the court that the case was on the mental docket and that "[u]ntil this morning, I had not conferred with my client." Defense counsel said it was "practically impossible" to comply with the notice requirement of the statute and

> "I anticipate that I would like to go forward with the mental disease or defect and that is why I feel that I should be allowed to inquire of the jury their feelings concerning that type of defense."[3]

The court then informed counsel that the cause had never been removed from the trial docket of May 12, 1975, and in the absence of any written intent or indication to the state that "you intended to rely on such a defense, it is not an issue before this Court . . . ." Defense counsel admitted that he would have no medical evidence concerning the competency of Mr. Vansandts but that it is "up to the jury to decide . . ." after watching and hearing him. The court thereupon restricted counsel from qualifying the jury on the defense of mental competency.

In chambers, the trial judge made a statement for the record. The judge indicated that the presiding judge of the circuit court had informed him that the cause was on the trial docket, and that the robbery took place in 1972, but the defendant was not available or could not be found until 1974. Previous judges had the defendant examined because the defendant had a tendency of injuring himself, necessitating hospitalization. The trial judge stated that reports were received indicating the de-

fendant was not suffering from a mental disease and was fit for trial, that defense counsel informed the court that he cannot adequately and intelligently confer with his client, but it is to be noted that "this defendant is supposedly acting in order to be confined to a hospital instead of prison." The court then stated for the record that while the jury was being impaneled the defendant sat absolutely motionless with his head hung low.[4] The court continued that his hair was "in disarrangement" and that:

> ". . . In walking from the counsel table to his cell, this Court noted he would stagger, he would walk in an unsteady gait. Sheriffs reported that he would lay [sic] down on the concrete floor of the courtroom cell. This Court has no way of knowing whether the action of this defendant is put on but it appears to this Court that this man has something seriously wrong with him. This Court, however, must, under all the circumstances, defer to the judgment of the medical reports in this file, all of which indicate that the actions of this defendant are such that he is putting on and he is mentally capable of standing trial. As far as this Court knows, there is no mental [medical?] evidence to be adduced which would indicate that he is mentally incompetent. The above observations were made by this Court and he is, in the opinion of this Court, mentally deranged or a perfect actor. This Court, however, under the circumstances, has no alternative but to proceed with trial."

Defense counsel then stated that it is the defense's position that "Mr. Vansandts is not competent to stand trial and [counsel] would request the Court to either [sic] have an independent hearing on that matter and permit the defendant to go to the jury on

**3.** The record shows that an attorney in the public defender's office was furnished a copy of the medical reports on February 14, 1975, and the court said they were undoubtedly in the file when the case was turned over to trial counsel. The minutes also reflect that on March 31, 1975, the cause was removed from the Mental Examination Docket and set for trial on May 12, 1975, and that trial counsel was the attorney of record throughout that period.

**4.** The report of Dr. Jacks stated that, "[d]uring interviewing his head is slightly bowed without eye contact."

the question of this man's mental competency—." Although he had no medical evidence, counsel anticipated that the evidence of mental incompetency would be from the defendant himself.

After discussion in chambers the trial proceeded. Before the state made its opening statement, defense counsel, outside the hearing of the jury, informed the court that:

". . . If the Court is not going to allow me to interpose the defense of mental disease or defect, then I feel it would be necessary for me to enter a few trial motions such as a motion to suppress statements and motion to suppress identification. I was furnished with copies of the police report yesterday. I would also request to the Court on its own[,] conduct . . . its own hearing, as to the competency of my man to stand trial. It is my opinion he is totally incompetent. This whole proceeding is in violation of his due process and that he does not understand or appreciate the nature of the proceedings that are occurring right now."

The court overruled the motions to suppress as being untimely and implicitly denied counsel's request for a competency hearing, having "previously expressed its position about [defendant's] mental condition."

After that the trial proceeded and testimony was taken. The state produced Hazel Burke, Kenneth Keisker and police officers. They testified as to the facts related above. Detective Bullis testified that the defendant made a statement that he struck Mrs. Burke. No objection was made to the introduction of either the lineup identification or the defendant's statement.

Upon the completion of the state's case, Mr. Vansandts testified. He was the only witness for the defense. His testimony was at best confusing. When asked if he knew why he was arrested, he answered, "Concealed with a Deadly Weapon and Robbery One" and for "what I did on hospital grounds [breaking into lockers]." He did not recall the September 28, 1972 incident and said he couldn't hit Mrs. Burke with a radio. "I couldn't do that; I can't fight." He admitted he spent a great deal of time in hospitals and attempted to commit suicide at "Malcolm Bliss twice and in jail," once with a plastic spoon.

He admitted using drugs and alcohol; he did not recall where he was on September 28, 1972, but recalled being arrested on Arsenal in August, 1974, where he was a patient in detoxification at the time. He thought he was arrested for having a butter knife in his pocket and for breaking some padlocks off some lockers "looking for alcohol pads, pills or rubbing alcohol or something." He testified that he first learned that he was being charged with robbery of the sandwich shop "[t]oday"—the day of the trial—and didn't remember discussing the matter with counsel. He recalled being examined by Dr. Dick and being at Fulton in January, 1975, but he could not recall whether he was in St. Louis during September, 1972.

On cross-examination, he admitted drinking heavily, but "can't do nothing" or "hurt nobody." He never had the thirty-eight dollars. During the cross-examination the prosecutor, after asking how far he went in school, asked if he could read. After replying yes, the defendant was then asked by the prosecutor to read the findings of the medical report prepared by Dr. Jacks. An objection was made to reading the specific findings. The prosecutor retorted, "I didn't introduce this mental defense into this case," whereupon the court stated, "I'll permit him to see if he can read it." The prosecutor then asked the defendant to read the findings of the report—that the accused has no mental disease or defect within the meaning of § 552.010. After a few questions, defense counsel again objected, which was sustained. Nevertheless, the reading continued, and the defendant, with a great deal of difficulty, read from the report of Dr. Jacks that (1) he has the capacity to understand the proceedings against him and can assist in his own defense, (2) he did know and appreciate the nature, quality and wrongfulness of his alleged conduct and was capable of conform-

ing his conduct to the requirements of the law, (3) he did not require hospitalization pending further proceedings, (4) he has no mental disease or defect within the meaning of the law, and (5) it was recommended that he be returned to the court for disposition of the charges pending against him. After this examination, and outside the hearing of the jury, the prosecutor requested defense counsel to stipulate that the findings of Dr. Gohil would be the same as Dr. Jacks. The court asked defense counsel, "Will you stipulate?" Counsel replied, "I would object to that because I think it does disallow me [sic] direct examination of these individuals." The prosecutor then said, "I'll bring a doctor in here tomorrow morning if you want to. . . . All I'm doing, is I want this jury to know that this man has been treated, been examined by not one, but three different people and he is in this courtroom because he should be here." Defense counsel then stipulated "to the findings of Dr. Gohil as being identical to that of Dr. Jacks." The prosecutor requested that defense counsel stipulate to Dr. "Gohil and I'll bring [Dr.] Dick in because he's the one I can get here on time." To that, defense counsel replied, "All right."

The proceedings resumed before the jury and the prosecutor informed the members that defense counsel agreed to stipulate that "in addition to Dr. Jacks, Mr. Vansandts was also examined by . . . Dr. Gohil, . . . and his findings were the same as that of Dr. Jacks." The prosecutor read these findings without objection.

Continuing with the cross-examination, Mr. Vansandts was asked how many times he has attempted to take his own life. His reply was, "Every time I get upset with myself. I don't have to be in jail; I don't have to be in the hospital."

On redirect examination, Vansandts was asked if he understood what he read to the jury concerning the reports. "Yeah, they said I didn't need no help."

On rebuttal, the state called Dr. Earl Dick, a psychiatrist. He testified that he examined Mr. Vansandts on April 16, 1975, after Vansandts was admitted upon order of Judge Bloom. Dr. Dick examined him for the purpose of determining his competency to stand trial. He found that Vansandts had an antisocial personality and was addicted to alcohol. The doctor testified that Missouri law does not recognize those diagnoses as being a mental disease or defect and that Mr. Vansandts did not need further hospitalization. The doctor was cross-examined. He was asked upon what he based his opinion that Vansandts understands the nature and quality of the charges against him and has the capacity to cooperate with counsel to formulate an adequate defense. His reply was, "Upon my discussing with him what he understood the charges to be," and upon "the information that he imparted to me about why he wanted to prolong his hospitalization until the 12th of May." The doctor testified that "[h]e has a great many social problems. He has a great many other problems, but for psychiatric illness, he does not. . . ."

After all the evidence was introduced, instructions were given to the jury. The appellant offered certain instructions[5] relating to the defense of mental disease and defect excluding responsibility, but they were refused.

After deliberation, the jury returned a verdict of guilty and assessed punishment at five years in the department of corrections. The appellant was not present at the time of the verdict. His absence was explained by the court in its closing remarks to the jury.[6] The judge also stated,

---

5. MAI–CR 3.72, MAI–CR 2.33, MAI–CR 3.70 and MAI–CR 2.32.

6. The court told the jury that while it was deliberating, there were indications that the defendant attempted to injure himself while confined in a cell in the rear of the court. "It

was obvious that he did inflict some injury about his throat, and this Court immediately summoned an ambulance. He also had completely undressed himself in the cell. . . . That is why he is not here in court at this time, and he is represented by his counsel . . . ."

"In recent years, I have sat in the criminal division of our courts. During that period of time I have tried literally hundreds of cases. I don't recall ever encountering a situation like this. Three different judges of this court . . . have ordered this man committed to hospitals for examinations. . . . These doctors have all found the same thing. . . .

. . . Something is wrong with this man but whether or not he's legally insane under the laws of this state, the doctors say he is not. . . ."

In due time, a motion for new trial was filed, and after the motion was overruled and allocution was granted, defendant was sentenced for a period of five years. After overruling the motion for new trial, the court in a separate memorandum indicated that the defendant acted strangely during the trial but that he had no mental disease or defect and was capable of standing trial. The memorandum of the trial court is attached hereto as Appendix II.

## II

On this appeal, appellant asserts four points urging us to reverse and remand the cause for a new trial. He contends that the trial court erred (1) in not granting him a "hearing" to determine his competency to stand trial because (a) trial counsel "contested" the findings contained in the psychiatric reports so that a hearing was mandatory under § 552.020, subsection 6, and (b) even if appellant did not "contest" the findings, counsel's protests coupled with the defendant's erratic behavior and incoherent testimony at trial raised a bona fide doubt as to his competency to stand trial which, under the authorities, necessitated a hearing; (2) in permitting the defendant over objection to read, on cross-examination, the psychiatric report regarding his mental condition because the contents of the report were "inadmissible hearsay" and would be considered by the jury as evidence which would contradict his appearance in court as a person of doubtful mental competency; (3) in precluding "the appellant from raising the defense of mental disease or defect [excluding responsibility?] by prohibiting [him] from inquiring upon the subject on voir dire and by refusing to give requested instructions" because (a) the preclusion was improper even though the appellant had not given the statutory notice,[7] since trial counsel was not assigned the case until after the ten-day limit had run and because counsel believed that the case was not immediately scheduled for trial, and (b) such preclusion was "wrongful notwithstanding that appellant's only evidence of mental disease or defect [excluding responsibility?] was his own testimony"; and (4) in not permitting counsel to present his motion to suppress statements made by the defendant and to suppress identification testimony, because such motions were not untimely.

Appellant argues that the court erred in not granting a competency hearing on the issue of fitness to proceed because he "contested" the opinion in the reports pursuant to § 552.020, subsection 6, which mandates a hearing "[i]f any such opinion is contested." He contends that although there were no formal objections to two of the reports, the discussions at trial during the voir dire when counsel attempted to qualify the jurors on the issue of mental incompetency and his request for an additional examination entitled "Objections to Findings" constituted a "contest" within the meaning of the law.[8] We reject appellant's contentions.

---

7. Section 552.030(2) provides that evidence of mental disease shall not be admissible at trial unless defendant at the time of entering his plea pleads not guilty by reason of mental disease or unless within ten days after a plea of not guilty or at such later date as the court may for good cause permit, he files a written notice of his purpose to rely on such defense.

8. Counsel stated, ". . . It is the defense's position that Mr. Vansandts is not competent to stand trial and would request the Court to either [?] have an independent hearing on that matter and [?] permit the defendant to go to the jury on the question of this man's mental competency—." After the prosecutor made his opening statement, defense counsel again, out of the hearing of the jury, said, ". . . If

## III

Section 552.020, subsection 6, provides:

"If neither the state nor the accused nor his counsel contests the opinion referred to in subsection 3, subdivision (3), of this section relative to fitness to proceed, the court may make a determination and finding of record on the basis of the report filed or may hold a hearing on its own motion. If any such opinion is contested the court shall hold a hearing on the issue. . . ."

There were three separate psychiatric reports filed in this case—January, March and April, 1975. There is no question that no "contest" was made to the March and April reports other than the statements of defense counsel at trial. As to the January report, a court memorandum dated February 13 indicates that the report had been received and neither the state nor the accused or counsel contested the findings. On February 18, defense counsel did file "Objections to Findings of Psychiatrist" pursuant to § 552.020, subsection 4 [not subsection 6] which authorizes the court to order another examination. This was done, and defendant was ordered examined by Mid-Missouri Mental Health Center. No "objection" was made to this second report, or to the third report, except for the comments at trial.

 Numerous Missouri decisions have indicated that there is no error in failing to have a competency hearing when a report is not "contested." [9] The applicable principle has been summarized as follows: (1) There is no error in foregoing a hearing in the absence of an objection by the defendant and of any other circumstances which render the opinion substantially suspect and (2) where there are circumstances that cast substantial suspicion on the opinion, the trial judge must sua sponte hold a hearing. *Newman v. State*, Mo., 481 S.W.2d 3, at 6.

The oral protestations made at trial did not refer to the reports and did not contest the reports but rather were objections to the court's rulings that the defendant could not present a defense of mental disease excluding responsibility.

 There were no objections prior to trial to the reports other than the request for an independent examination pursuant to § 552.020, subsection 4, not subsection 6. Under the facts here, we hold that neither the accused nor his counsel "contested" the findings of at least two of the reports prior to trial and that the oral protestations and requests made at the beginning of the trial did not constitute a "contest" [10] within the meaning of § 552.020, subsection 6.[11]

 Section 552.020 is designed to present an orderly process to determine the issue of fitness to proceed. It implies that the "contest" must be made prior to trial, and if so made the court shall hold a hearing on the issue.

Alternatively, appellant argues that, even if he did not "contest" the reports, the court was required to hold a competency hearing because counsel's "protests and requests" and defendant's "erratic" behavior raised a

the Court is not going to allow me to interpose the defense of mental disease or defect, then . . . I would also request to the Court on its own conduct, [sic] its own hearing, as to the competency of my man to stand trial . . ."

**9.** Various terms other than "contest" are used. *Newman v. State*, 481 S.W.2d 3, 6 (Mo.1972) [there is no error in foregoing a hearing in the absence of "objection" by the defendant]; *McCormick v. State*, 463 S.W.2d 789, 791 (Mo. 1971) [no "contest"]; *Collins v. State*, 479 S.W.2d 470, 471 (Mo.1972) [trial court not required to conduct hearing where no "exception" was taken to report]; *Anderson v. State*, 493 S.W.2d 681, 684 (Mo.App.1973) [a judicial competency hearing is not required in the absence of "objection" to the report or other circumstances which rendered the report substantially suspect].

**10.** Contest: "1: to make the subject of dispute, contention . . . 2: to make a subject of litigation: dispute or resist by course of law . . . ." Webster's Third New International Dictionary, Unabridged (1961).

**11.** Appellant relies on the dissent in *State v. Brizendine*, 433 S.W.2d 321, 335 (Mo.banc 1968), a view not adopted by the majority of the Court.

"bona fide doubt" of his fitness to stand trial.

■ It is, of course, clear that by "dictate of the American conscience, long steeped in hallowed traditions of basic fair play and justice, judicial and statutory safeguards have been created to balance the adversary proceeding where it appears that an accused is suffering from a mental disease or defect." *Briggs v. State*, supra, 509 S.W.2d at 156. It is also clear that under our civilized values and our statutes, § 552.-020(1), an accused who lacks mental capacity to understand the proceedings against him or to assist in his own defense may not be subjected to a criminal trial. *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975); *McCarthy v. State*, 502 S.W.2d 397, 402 (Mo.App.1973); *Miller v. State*, 498 S.W.2d 79, 83 (Mo.App.1973). The test is whether the accused has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960); *McCarthy v. State*, supra, 502 S.W.2d at 403.

■ In *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the United States Supreme Court elevated these basic principles to constitutional dimensions and held that "where the evidence raises a 'bona fide doubt' as to the defendant's competence to stand trial, the judge on his own motion must" conduct a hearing on the question, whether requested or not. *Pate v. Robinson*, supra, 383 U.S. at 385, 86 S.Ct. 836.[12]

■ But, under the principles of *Robinson*, our statutes and the judicial decisions in this state, the trial court is not required to conduct a competency hearing *sua sponte* in the absence of circumstances and evidence of mental disease or defect excluding fitness to proceed. As stated in *Miller v. State*, supra, 498 S.W.2d at 85, the court is not required to conduct a competency hearing *sua sponte* in the absence of circumstances which render suspect the psychiatric opinion certifying the accused fit to proceed. The suspicion or actual presence of some degree of mental illness or need for treatment is not to be equated with incompetency to stand trial or mental disease and does not require a *sua sponte* hearing. *McCarthy v. State*, supra, 502 S.W.2d at 403.[13] It is not sufficient that a trial judge may "feel" that a defendant needs psychiatric help. This standing alone is not an expression of a bona fide doubt necessitating a competency hearing. There must be circumstances or evidence of some mental disease or defect before the court is required to hold a hearing *sua sponte*. A bona fide doubt of mental disease or defect must exist. Mental disease does not include alcoholism without psychosis or drug abuse without psychosis. § 552.010.

■ Appellant argues that a bona fide doubt was raised as to his fitness to proceed because (1) on three separate occasions the

**12.** Missouri courts have used different terms—"substantial suspicion," "reasonable doubt," etc. See *Miller v. State*, supra, 498 S.W.2d at 83, fn. 1; see also *Green v. United States*, 128 U.S.App.D.C. 408, 389 F.2d 949, 954, 955 (1967), quoted in *McCormick v. State*, supra, 463 S.W.2d at 790.

**13.** Several Missouri decisions have found the evidence insufficient to raise a bona fide doubt concerning the accused's competency so as to require a hearing: (1) The mere presence of some mental problem does not necessarily raise reasonable doubt requiring a *sua sponte* hearing, *McCarthy v. State*, supra, 502 S.W.2d at 403; (2) the fact that the accused was mentally retarded, *Pulliam v. State*, 480 S.W.2d 896, 904 (Mo.1972); (3) the fact that an accused attempted suicide, *Drope v. State*, 498 S.W.2d 838, 843 (Mo.App.1973), rev'd, *Drope v. Missouri*, supra, 420 U.S. 77, 95 S.Ct. 896, 43 L.Ed.2d 32; (4) the fact that defendant was an alleged alcoholic, *State v. Harris*, 477 S.W.2d 42, 45 (Mo.1972); (5) evidence of drug abuse without concomitant psychosis, *Jones v. State*, 471 S.W.2d 223, 225 (Mo.1971); (6) defense counsel's bare assertions that defendant is incompetent to stand trial, *State v. Rand*, 496 S.W.2d 30, 37 (Mo.App.1973); (7) claimed amnesia, *State v. Gardner*, 534 S.W.2d 284, 289 (Mo.App.1976). See also *State v. Stein*, 504 S.W.2d 1 (Mo.1974); *Newbold v. State*, 492 S.W.2d 809 (Mo.1973).

trial court noted appellant's conduct during the trial and at the time of the verdict, (2) the appellant testified incoherently and was unable to remember the alleged sandwich shop robbery, (3) of his "erratic" behavior in court, and (4) counsel's assertion that he believed that the defendant was unable to proceed was sufficient to raise a bona fide doubt as to his competency which required a hearing. But, considering the unique facts of this case and that the three prior psychiatric reports all indicated that appellant was fit to proceed, we cannot conclude that the trial court erred or abused its discretion in not granting, *sua sponte*, a competency hearing to determine the appellant's fitness to proceed.

Each of the reports indicated that the appellant was not psychotic and did not suffer from a mental disease or defect within the meaning of the law but suffered from alcohol addiction and that he had an antisocial personality. Appellant was described as "manipulative and demanding." His actions at trial were consistent with and conformed to the facts stated in the psychiatric reports; although at trial he did not recall the robbery incident in 1972 but thought he was charged with carrying a concealed weapon, this was explained in the report of Dr. Gohil as not being unusual in persons suffering from intoxication. The report of Dr. Jacks indicated that appellant realized he was charged with robbery of the sandwich shop. The reports and the testimony of Dr. Dick at trial indicated that appellant had the capability to stand trial, that he understood the nature and quality of the charges and that he had the capacity to cooperate with counsel. Dr. Dick summarized the whole of the facts: "He has a

great many social problems. He has a great many other problems, but for psychiatric illness, he does not. . . ." The infliction of wounds upon himself and "suicidal attempts" were explained by Dr. Dick as an effort to remain in a hospital rather than in a jail. The psychiatric reports noted much the same behavior on the part of appellant as noted by the trial court, and prophetically, Dr. Dick in his April 30 report shortly before trial said, "it may be anticipated that he would attempt to inflict lacerations on himself were he to believe such behavior would gain him a desired goal." During the jury deliberations, that statement became true.

Under all these facts and circumstances and in accordance with previous judicial decisions,[14] we conclude that the trial court did not err in failing to hold a *sua sponte* hearing on the issue of fitness to proceed.

## IV

Next, appellant contends that the court erred in "requiring" Mr. Vansandts to read from the report of Dr. Jacks that he had the capacity to understand the proceedings against him and to assist in his own defense, because the reports were hearsay and tended to contradict appellant's appearance in court as a person of doubtful mental capacity which would affect his credibility as a witness. He relies only on the general principle stated in McCormick on Evidence that where the danger of the jury's misuse of the evidence for the incompetent purpose is great and its value for a legitimate purpose is slight, the judge's power to exclude the evidence altogether would be recog-

---

**14.** *Miller v. State*, supra, 498 S.W.2d 79; *McCarthy v. State*, supra, 502 S.W.2d 397; *Anderson v. State*, supra, 493 S.W.2d 681; and *State v. Rand*, supra, 496 S.W.2d 30.

*Drope v. Missouri*, supra, 420 U.S. 77, 95 S.Ct. 896, 43 L.Ed.2d 32, is not dispositive of the issues here. In *Drope*, petitioner's wife testified, repeating and confirming information concerning his strange behavior which was contained in the report. On the second day of trial petitioner shot himself in a suicide attempt. The Supreme Court held that Missouri courts did not accord proper weight to the

evidence suggesting incompetency which gave rise to a sufficient doubt of petitioner's competence to stand trial and remanded the case for further proceedings. Here, all three reports indicated that he was fit to stand trial, and his conduct, including his "suicide" attempts, conformed to the findings of the reports. The reports here indicate that as early as 1972 Mr. Vansandts did not suffer from any mental disease but was addicted to alcohol and had an antisocial personality. And, unlike *Drope*, no new information came to light during the trial.

nized. McCormick, Evidence, § 59 at 136 (2d ed. 1972).

This evidence came in at a point in the trial when the appellant was being cross-examined by the assistant circuit attorney. Much had gone before. Initially, counsel for defendant desired to use as a defense the defense of mental disease or defect excluding responsibility and contended appellant was not competent to stand trial. He urged that the court conduct a competency hearing; he in effect attempted to use the defense of mental competency through the use of the defendant's own testimony. The appellant testified that he thought he was arrested for carrying a concealed weapon; he testified that he did not know where the sandwich shop was located; he stated that he had spent some time in mental institutions; he admitted that he attempted to commit suicide; he testified he did not recall the incident of September 28; and he recalled telling Dr. Dick during the examination that he thought he was charged with "breaking them lockers [which] was Robbery One." Then, on cross-examination, he was asked if he could read and his reply was, "Yes." The prosecutor then asked him to read from the report of Dr. Jacks. Defense counsel objected to the reading of specific findings. The court stated it would permit him to read it. After a few questions and answers, defense counsel again objected. The reading of the conclusions of the report continued, and the defendant read from the report. After the conclusions in the report were read, the prosecutor requested defense counsel to stipulate that Dr. Gohil's report was the same as Dr. Jacks'. Again an objection was made, but counsel did stipulate that Dr. Gohil's report was the same as Dr. Jacks', and the prosecutor read Dr. Gohil's findings.

Later, Dr. Dick testified as to substantially the same factors contained in the reports, that the appellant was able to stand trial and that he suffered from alcohol addiction and an antisocial personality.

Under these unique circumstances, we cannot conclude that there was prejudicial error in permitting the appellant to read from the report on cross-examination. It is axiomatic that the scope of cross-examination lies within the sound discretion of the trial court and that an appellate court will not reverse unless there is a clear abuse of discretion. *State v. Rice*, 522 S.W.2d 335, 338 (Mo.App.1975). It is also the rule that the prosecutor may inquire in detail concerning anything within the fair purview of the direct examination. *State v. Dalton*, 433 S.W.2d 562, 564 (Mo.1968).

While we strongly disapprove of the method used by the prosecutor in practically reading the report and while we disapprove of using, on cross-examination, the conclusions and medical findings for the purpose of determining mental competency or impeachment of the defendant, under the facts here we cannot say that the cross-examination was prejudicial. Defense counsel did not comply with the notice requirement of the defense of mental disease and defect. Mental competency was injected into the case by defense counsel on the direct examination of the appellant and even prior thereto, despite the failure to comply with the notice requirement and despite the rulings of the court that mental competency was not an issue in the case. Hence, the cross-examination was retaliatory, and error, if any, was invited. *State v. Crocker*, 275 S.W.2d 293, 296 (Mo.1955). Having testified about mental matters on direct examination, the state was permitted to refute those matters. Therefore, where the mental competency was injected into the case despite the failure to comply with the notice statute and where Dr. Dick testified substantially to the same factors and conclusions which were included in Dr. Jacks' report, we cannot say that there was prejudicial error.

We rule this point against appellant.

## V

Next, appellant complains that the trial court improperly precluded appellant from raising the defense of mental disease or defect excluding responsibility by prohibiting the appellant from inquiring into the

subject on voir dire and by refusing to give his requested instructions. He also contends that the preclusion of the defense was "wrongful notwithstanding that appellant's only evidence of mental disease or defect was his own testimony."

■ This point is without merit. Section 552.030, subsection 2, is explicit. Evidence of mental disease excluding responsibility is not admissible unless, within ten days after a plea of not guilty or at such later date as the court may for good cause permit, the defendant files a written notice of his purpose to rely on such defense. There is no question in this case that no such notice was given. Appellant, however, seeks to excuse such notice because trial counsel was not assigned the case until after the ten day limit had run and because counsel believed that the case was not immediately scheduled for trial.

■ This is not a meritorious excuse. Trial counsel had been counsel of record since February 14, 1975—months before trial. Counsel had ample opportunity to file a written notice. The record reflects also that the cause was removed from the Mental Docket on March 31, 1975, and placed on the trial docket for May 12, 1975. There was no error in this regard, and this point is ruled adversely to the appellant. *State v. McIntosh*, 492 S.W.2d 843, 844 (Mo.1973); *State v. Lowe*, 442 S.W.2d 525, 529 (Mo. 1969).

■ Neither was there error in refusing to give the requested instructions. Appellant urges that no medical or expert testimony is required to justify giving instructions on the defense of mental disease or defect excluding responsibility. This may well be true. *State v. Peck*, 429 S.W.2d 247, 250 (Mo.1968). But Section 552.030(7) provides that persons are presumed to be free of mental disease or defect and the issue of whether any person had a mental disease or defect excluding responsibility for his conduct is one for the jury to decide upon the introduction of substantial evidence of lack of such responsibility.

■ Appellant contends that the defendant's testimony was "quite incoherent,"

that he could recall nothing about the incident, and his demeanor was such that the trial court made several observations about it. But these circumstances and the fact that appellant testified that he had spent time in hospitals and had attempted suicide do not rise to the level of "substantial evidence" of lack of responsibility or a mental disease or defect excluding responsibility within the meaning of Chapter 552. *State v. Bacon*, 501 S.W.2d 499, 501 (Mo.App. 1973); cf. *State v. Olinger*, 396 S.W.2d 617, 620 (Mo.1965).

The trial court did not err in this regard.

## VI

Lastly, appellant contends that the court erred in not permitting defense counsel to present a motion to suppress statements made by defendant and a motion to suppress identification testimony because the trial court was in error when it held that such motions were untimely.

■ There is no merit in this contention. The matter was not preserved. To preserve the matter, appellant should file a pretrial motion and keep the issue alive by proper objection. *State v. Johnson*, 533 S.W.2d 629, 631 (Mo.App.1976). No objection was made at trial to the introduction of statements of defendant or his identification. Hence, these matters were not preserved. *State v. Ward*, 518 S.W.2d 333, 334 (Mo. App.1975); *State v. Wade*, 535 S.W.2d 492, 495 (Mo.App.1976); *State v. Holland*, 534 S.W.2d 590, 591 (Mo.App.1976).

■ Nevertheless, no such motions to suppress were filed prior to trial. The trial court has some discretion in handling procedural aspects of matters that can be determined prior to trial. *State v. Jordan*, 506 S.W.2d 74, 79 (Mo.App.1974).

## VII

We have read the entire transcript; we have reviewed the briefs of the parties and all of the authorities relied upon. We are convinced that there is no prejudicial error.

The judgment of conviction is therefore affirmed.

KELLY, J., concurs in separate opinion.

GUNN, J., concurs.

## APPENDIX I

### Summary of Physicians' Reports

#### (a) Report of Dr. Jacks.

The report of Dr. Richard K. Jacks, dated January 29, 1975, indicated that Mr. Vansandts had been arrested on a variety of charges, had a history of multiple prior psychiatric hospitalizations dating back to 1959 and in 1959 was admitted to Fulton State Hospital as an administrative transfer from Boonville. Psychological testing revealed that he was functioning in the borderline mentally defective range of intelligence with an IQ of 75. His actual level of intellectual functioning was "felt to be somewhat higher." Early in life, he was given a diagnosis of schizophrenic reaction, childhood type. In 1960, he was transferred from Fulton to Nevada State Hospital so that he could be closer to his parental home. He remained there until 1967. In 1970, he was voluntarily readmitted for treatment of drug and alcohol abuse. He was given a diagnosis of paranoid schizophrenia and treated. He was discharged in April, 1971. In May, 1972, he was admitted by order of the probate court to the St. Louis State Hospital. That admission was precipitated by a history of drug abuse and a charge of robbery. The records of the St. Louis State Hospital indicate he was given an official diagnosis of personality disorder, antisocial type. He was discharged September 20, 1972. Then in August, 1974, he voluntarily readmitted himself to the St. Louis State Hospital because of excessive drinking and claimed visual and auditory hallucinations, but no other evidence of psychotic symptoms were noted. He was diagnosed as suffering from alcohol addiction, drug addiction and antisocial personality. While in the hospital, there were repeated incidents of breaking into other patients' lockers. He was discharged on August 31, 1974, and on the same date was admitted to Malcolm Bliss. Records at Malcolm Bliss indicated that he was "uncooperative, prone to angry outbursts, hostile, aggressive, manipulative and demanding." A few days later he was released to the police but on September 30, 1974 was readmitted to Malcolm Bliss from Homer G. Phillips Hospital, where he had apparently made a suicidal gesture by slashing his chest and arms. He was again found to be oriented, coherent and without evidence of a psychotic thought disorder. Again he was given a diagnosis of alcohol addiction, drug abuse and antisocial personality. He was discharged on October 30, 1974 to law enforcement officials with the finding that he was competent to cooperate with counsel in preparing a defense with reference to the charges pending against him.

The report of Dr. Jacks states that the patient "is a forlorn-looking white male," and during interview "his head is slightly bowed without eye contact." "He correctly knows his name, the place and the date and realizes he is being examined psychiatrically because of an offense." His speech comes in "low volume and is monotonous." With respect to his alleged offense, "he believes he is being charged with taking money out of an employee's wallet when he was seen recently in St. Louis State Hospital. . . . He does realize that at one point he was charged with robbery of a sandwich shop in the St. Louis area." Dr. Jacks concluded that Mr. Vansandts is of borderline intelligence "but with adequate contact with his surroundings." He has had a history of behavior problems since childhood. Although at one time a diagnosis of childhood schizophrenia was made and several succeeding hospitalizations carry a diagnosis of his being psychotic, as early as 1972 his frequent hospitalizations found him not to be psychotic but rather "antisocial in his behavior and also alcoholic."

"His entire history is basically consistent with that of an antisocial character disorder with onset at least by age thirteen of repetitive criminal behavior appearing without remorse and eventually alcoholism. This examination finds no evidence of a mental illness which would impair his responsibility at the time of his of-

fense and there isn't any evidence of a mental illness which would limit his ability to cooperate with counsel."

Dr. Jacks concluded that (1) he had no mental disease or defect within the meaning of § 552.010, (2) he has the capacity to understand the proceedings against him and can assist in his own defense, (3) he did know and appreciate the nature, quality and wrongfulness of his alleged conduct, and (4) he does not require hospitalization pending further proceedings. Dr. Jacks recommended, therefore, that he be returned to court for disposition of the charges pending against him.

### (b) Report of Dr. Gohil.

The second report, of Dr. Jivanlal P. Gohil, in March, is of a similar vein. Dr. Gohil recited the multiple prior psychiatric hospitalizations and the history of drug abuse and alcohol addiction. Dr. Gohil reported that during the psychiatric interviews he was quiet and cooperative, his speech was "spontaneous, coherent and relevant yet the tone was despondent as if he [were] burdened with stress. Most of the time he talked about 'getting help for my problems and getting rehabilitated for my alcoholism.'" Although he claimed he had no recall of the incident for which he was charged, he was aware of the reason and the purpose of the examination and "is well aware of consequences if he is found guilty." The report stated, "He is familiar with the principals [sic] in the court room process." He was diagnosed as having an antisocial personality. The report concluded that Mr. Vansandts "has not displayed any gross disorder of thinking, mood, affect, or perception." Although the patient does not recall the incident for which he has been charged, "this could be due to intoxication. It is not unusual for individuals to suffer periodic lapses of memory or having no recall of certain events or actions due to alcohol intoxication." Dr. Gohil concluded that there is no evidence of mental illness which would impair his responsibility or limit his ability to cooperate with counsel. The findings and conclusions were the same as those of Dr. Jacks.

### (c) Report of Dr. Dick.

The third report, dated April 30, 1975, by Dr. Earl P. Dick, M.D., was specifically for the purpose of determining whether Vansandts was competent to stand trial, and "criminal responsibility was not to be addressed." The report of Dr. Dick indicated that Vansandts related he is scheduled to appear in court on May 12, 1975 as a result of charges of having a concealed deadly weapon when he was an inpatient in a detoxification unit at Missouri Psychiatric Institute on Arsenal Street. Vansandts related that he was working in the food lines and mistakenly placed a butter knife in his pocket and attempted to open a staff locker. During the interview he requested that he be permitted to remain at Malcolm Bliss until the day before trial because people in jail "tease me and hurt my feelings . . . . If I go back [to jail] I'll continue to hurt myself." Dr. Dick concluded, after examination, that (1) there was no "clinical picture consistent with mental disease or defect," (2) the patient was "highly manipulative and inflicted superficial lacerations on himself whenever he feared he would be returned to the correctional facility," (3) his mental state disclosed his behavior to be "goal motivated; designed and implemented to keep him in the hospital," (4) he had an antisocial personality and suffered from alcohol addiction, (5) he understands "the nature and quality of the charges against him and has the capacity to cooperate with his counsel to formulate an adequate defense," and (6) no hospitalization pending judicial proceedings was required. Dr. Dick in the closing lines of his report stated: "It may be anticipated that he would attempt to inflict lacerations on himself were he to believe such behavior would gain him a desired goal."

## APPENDIX II

### "MEMORANDUM OF THE [TRIAL] COURT RE MOTION FOR NEW TRIAL"

". . .

"In several paragraphs of this motion the defendant complains that the Court refused

him his right to raise the defense of mental disease or defect. The record shows . . that three different judges . . . were confronted with this problem . . . . As a result, three judges of this Court had this defendant examined . . . . [A]ll the reports agree that this man is not, under the Missouri law, suffering from any mental disease or defect that would prevent him from standing trial on the charges in this case.

". . . Defense counsel at no time followed the rules to present the defense of mental defect although he had been aware of this problem for several months prior to trial. Defense counsel was further asked by this Court whether he had any medical evidence to support his alleged offense [sic —defense?] of mental incapacity, and he indicated he had not, that the only defense that he intended to offer was the defendant. This Court felt, for the reasons above-stated, that the defendant was not entitled to present this defense.

"This defendant has been a problem to the Sheriff's Office of this City since his arrest. He had, on numerous occasions, scratched his arms and body, causing the parts injured to bleed. However, indications are that none of these self-inflicted wounds were of any significance, and it was the opinion of all concerned that he was merely doing these things to create sympathy.

"During the course of the trial, defendant walked out, sat at counsel table and at no time ever raised his head to look about the courtroom or to look at the jury. He walked in a swaying and stumbling fashion. This Court has previously indicated into the record that something appeared, obviously, wrong with this defendant. He did take the stand and in response to questions by his own attorney and by the prosecuting attorney, he just mumbled. It is to be noted that in Paragraph 8 of defense counsel's motion he said the Court erred in permitting the prosecutor and the defendant from [sic] reading from psychiatric reports.

It is to be noted that at no time did defense counsel object during the course of the trial to these proceedings. Therefore, the Court is not going to, and cannot consider this ground of defendant's motion.

"This case was presented to the jury, and the jury retired. While in the course of their deliberations, it was called to the attention of the Court that this defendant attempted suicide by, in some manner, inflicting a wound in the throat. He fully undressed himself in the cell and did appear to be bleeding. The Court immediately summoned an ambulance and ordered this defendant transported to the City Hospital. The jury was deliberating at the time. The jury had no knowledge of what had taken place. The jury deliberated in this case for about forty minutes and returned a verdict of guilty as charged and assessed punishment at five (5) years in the Missouri Department of Corrections. This defendant was not present in court when the verdict was received. He was not present because of his own actions in inflicting the wound that caused the Court to send him to a hospital. The jury verdict was received in the presence of defendant's attorney, and the jury was polled. The jury was then discharged, and the verdict of the jury was received by the Court. Shortly after the jury was discharged the defendant was returned from the City Hospital. The wound that he inflicted was superficial, did not require any further treatment or hospitalization. Punishment was then assessed and the defendant was sent to the City Jail.

"On May 16th the defendant was again brought into Court, and his Motion for New Trial was overruled. This defendant, at that time, spoke very coherently to the Court, and there were times throughout this trial that when he wanted to make a statement, he do [sic] so freely and without any problems. The actions of this defendant, observed by the Court, leaves [sic] this Court to believe that the medical reports in this file and the medical testimony adduced is clear that under the Missouri law, this defendant is not suffering from any mental defect. It is obvious that at age twenty-

nine this man is an alcoholic that is in obvious need of some type of medical attention. The Court is not in any position to comment further in that respect except to advise that, as far as the Missouri law is concerned, he is not deemed to be mentally deficient."

KELLY, Judge (concurring).

I concur in the result, but I would have overruled appellant's second point for the reason that it is not properly before this court for review. Appellate courts are too busy ruling on matters properly brought before them for review to be required to search the transcript, motion for new trial and briefs to ascertain what it is that counsel contends entitles the appellant to a new trial. It is becoming ever more essential that counsel, both in the trial court and in the appellate briefs, preserve the record and correctly state the points on appeal by which it is sought to have reviewed what errors are to be the basis for appeal so that those points worthy of careful scrutiny can be afforded the time necessary to thoughtfully and correctly decide them.

At the time the assistant circuit attorney sought to have the appellant read the "findings" of Dr. Jacks, the only objection lodged was: "I object to him reading the specific findings. If Mr. Murphy wants to see if Mr. Vansandts can read, it's fine with me, but I would request that he be permitted to read something that is not pertinent to this case."

In appellant's Motion for New Trial the only paragraph making reference to this procedure is as follows: "8. The Court erred in permitting the findings of a psychiatric report concerning the defendant to be read to the jury by the defendant and the circuit attorney, as this precluded the defendant from conducting adequate cross-examination."

In appellant's brief filed here this point is stated as follows: "The trial court erred in requiring the defendant on cross-examination in the presence of the jury to read from psychiatric reports regarding his mental condition, over the objection of defense counsel. The contents of the reports were inadmissible hearsay and would have been considered by the jury as evidence contradicting his appearance in court as a person of doubtful mental competency and would improperly affect his credibility as a witness."

It is apparent from the foregoing that appellant's objection at trial was at best a general objection and did not state any evidentiary rule upon which the objection should be sustained. The office of an objection is to advise the trial court of a valid reason for the objection so that the trial court is afforded an opportunity to rule. In the absence of such an objection which is sufficiently specific to advise the trial court of the basis for the objection, nothing is preserved for review in an appellate court, even if raised for the first time in a motion for new trial. *State v. Fields*, 434 S.W.2d 507, 512–513[1, 2] (Mo.1968).

Nor is the point properly preserved in appellant's Motion for New Trial. Rule 27.20(a) requires that the specific grounds of causes for a new trial must be set forth in detail and with particularity. We daresay appellant's paragraph 8 in his Motion for New Trial falls far short of this mark, and does not meet the standards of the Rule.

Finally, in appellant's brief, we are advised that the basis for his contention that the trial court erred is founded upon a violation of the hearsay rule. However, it is the rule of this jurisdiction that an objection cannot be broadened on appeal beyond that made in the trial court. *Dyer v. Globe-Democrat Publishing Co.*, 378 S.W.2d 570, 582[9] (Mo.1964), *Missouri State Park Board v. McDaniel*, 473 S.W.2d 774, 778 (Mo.App. 1971).